# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ADVANCED INTEGRATED CIRCUIT PROCESS LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED MICROELECTRONICS CORPORATION,<br><br>*Defendant.* | § § § § § § § § § § § § § | Case No. 2:24-CV-730-JRG<br>(Lead Case) |
| ADVANCED INTEGRATED CIRCUIT PROCESS LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>TAIWAN SEMICONDUCTOR MANUFACTURING COMPANY LIMITED,<br><br>*Defendant.* | § § § § § § § § § § § § § | Case No. 2:24-CV-623-JRG<br>(Member Case) |

## <u>MEMORANDUM OPINION AND ORDER</u>

On December 18, 2025, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 7,579,227 ("'227 Patent"), U.S. Patent No. 7,923,764 ("'764 Patent"), U.S. Patent No. 8,253,180 ("'180 Patent"), U.S. Patent No. 8,587,076 ("'076 Patent"), and U.S. Patent No. 8,796,779 ("'779 Patent") (collectively, the "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction

briefing (Dkt. Nos. 159, 162, 164)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................ 4

II.   APPLICABLE LAW ........................................................................................ 5

III.  LEVEL OF ORDINARY SKILL IN THE ART ............................................. 10

IV.   CONSTRUCTION OF AGREED TERMS ..................................................... 11

V.    CONSTRUCTION OF DISPUTED TERMS .................................................. 12

      A. "gate insulating film" ............................................................................ 12

      B. "outer end of the insulating sidewall" .................................................. 21

      C. "offset sidewall" .................................................................................... 24

      D. "sidewall spacer" ................................................................................... 27

      E. "[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers" ................................................................................ 34

      F. "effective work function" ...................................................................... 36

VI.   CONCLUSION ................................................................................................ 38

## I.    BACKGROUND

Plaintiff Advanced Integrated Circuit Process LLC ("AICP" or "Plaintiff") alleges that Defendant Taiwan Semiconductor Manufacturing Company Limited ("TSMC") and Defendant United Microelectronics Corp. ("UMC") (collectively "Defendants") infringe the Asserted Patents. The '227, '764, '180, and '076 Patents (collectively, the "Hirase Patents") are in the same family and share a common specification. The Hirase Patents are generally directed to a semiconductor device in which a high dielectric constant gate insulating film is formed on an active region in a substrate, a gate electrode is formed on this gate insulating film, and one or more sidewalls is formed adjacent to the gate electrode. '076 Patent at Abstract. "The high dielectric constant gate insulating film is continuously formed so as to extend from under the gate electrode to under the insulating sidewall." *Id*.

The Abstract of the '076 Patent states:

> A semiconductor device includes: a high dielectric constant gate insulating film formed on an active region in a substrate; a gate electrode formed on the high dielectric constant gate insulating film; and an insulating sidewall formed on each side surface of the gate electrode. The high dielectric constant gate insulating film is continuously formed so as to extend from under the gate electrode to under the insulating sidewall. At least part of the high dielectric constant gate insulating film located under the insulating sidewall has a smaller thickness than a thickness of part of the high dielectric constant gate insulating film located under the gate electrode.

Claim 1 of the '076 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1. A semiconductor device comprising:
> a *gate insulating film* formed on an active region in a substrate and including Hf;
> a gate electrode formed on the *gate insulating film*;
> a insulating sidewall formed on each side surface of the gate electrode; and

> wherein a width of the *gate insulating film* along a gate length is larger than a width of the gate electrode along the gate length, and
>
> an end of the *gate insulating film* under the insulating sidewall is retracted from an *outer end of the insulating* sidewall toward the gate electrode.

The '779 Patent relates to "metal insulator semiconductor" (MIS) devices "on an identical substrate." '779 Patent at 1:48–51. The '779 Patent sought to "enable formation of a plurality of transistors of the same conductivity type having different work functions in a semiconductor device having a MIS structure in which a high-k film is used as a gate insulating film." *Id.* at 3:50–54. The first transistor's interface layer is thicker than the second transistor's interface layer. *Id.* at 9:55–10:5. The specification states that increasing the thickness of a transistor's interface layer leads to an increased "equivalent oxide thickness" (abbreviated by the Patent as "EOT"), which then results in an increased "effective work function of the transistors." *Id.* at 12:47–54.

The Abstract of the '779 Patent states:

> A first MIS transistor and a second MIS transistor of the same conductivity type are formed on an identical semiconductor substrate. An interface layer included in a gate insulating film of the first MIS transistor has a thickness larger than that of an interface layer included in a gate insulating film of the second MIS transistor.

Claim 2 of the '779 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 2. The semiconductor device of claim 1, wherein the first gate electrode includes first *sidewall spacers* formed on side surfaces thereof and *first insulating spacers interposed between the first gate electrode and the first sidewall spacers*, the second gate electrode includes second *sidewall spacers* formed on side surfaces thereof and *second insulating spacers interposed between the second gate electrode and the second sidewall spacers*, and the first insulating spacers are thinner than the second insulating spacers.

## II.    APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim

terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the

"evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.     Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

For the Asserted Patents, Plaintiff's expert, Dr. Harris, opines that a POSITA "would have had (1) a bachelor's degree in electrical engineering or a related field and approximately two years of industry or academic experience designing or analyzing integrated circuits, or (2) a master's degree or Ph.D. in electrical engineering or an equivalent field, with coursework, thesis, dissertation work, or research experience in semiconductors and integrated circuits." (Dkt. No. 159-9 at ¶ 10.)

For the Hirase Patents, Defendants argue that a POSITA "would have had at least a Masters' degree in electrical engineering, physics, chemistry, materials science, or related fields, and three years of work experience in semiconductor manufacturing." (Dkt. No. 162 at 9.) Defendants further argue that "[a]dditional graduate education could substitute for work experience, and additional work experience/training could substitute for formal education." *Id.* For the '779 Patent, Defendants contend that "[t]he same POSITA definition as the Hirase patents should apply, except that the required work experience should also include work on the manufacturing of planar transistors." *Id.* at 27.

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds a POSITA would have had a bachelor's degree in electrical engineering, physics, chemistry, materials science, or related field, and approximately two years of industry or academic experience designing or analyzing integrated circuits. Additional education may substitute for industry experience, or vice versa. The Court notes that any differences in the parties' proposals do not appear to be significant for the purpose of claim construction.

## IV.    CONSTRUCTION OF AGREED TERMS

On December 17, 2025, Plaintiff notified the Court via email that it agreed to Defendants' proposal of plain and ordinary meaning for each of the following claim terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "substrate" ('227 Patent: Claim 1; '764 Patent: Claim 1; '180 Patent: Claim 1; '076 Patent: Claim 1) | Plain and ordinary meaning. |
| "retracted from" ('076 Patent: Claim 1) | Plain and ordinary meaning. |
| "made of the second metal film" ('686 Patent: Claim 29) | Plain and ordinary meaning. |

|  |  |
|--|--|
|  |  |

In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

## V.    CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of six terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A.  "gate insulating film"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "gate insulating film" | Plain and Ordinary Meaning. | "gate insulating film wherein each side end portion is not in contact with any overlying insulating sidewall" |

### 1.  Analysis

The term "gate insulating film" appears in Asserted Claims 1, 2, and 4 of the '227 Patent; Asserted Claims 1, 5, 6, 11, 12, 13, 16, 17, 18, and 19 of the '764 Patent; Asserted Claims 1, 5, 6, 11, 13, 16, 17, 18, 19, 21, and 22 of the '180 Patent; and Asserted Claims 1, 3, 6, 7, 10, 11, 12, and 13 of the '076 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "gate insulating film" requires construction. Defendants argue that their construction "aligns with the intrinsic evidence by (1) capturing the 'present invention' presented as the alleged solution to the disparaged prior art's problem, (2) reflecting the specification's definition explicitly or by implication, and (3) being supported, as an independent basis, by the Hirase Patents' unequivocal disavowal." (Dkt. No. 162 at 9-10.)

The Court finds that Defendants' limitation misrepresents the scope of "the present invention," and they fail to show any express or implied definition or unequivocal disavowal. The specification states that Figures 16A and 16B depict the prior art. ('076 Patent at 5:53–54.) These

figures discloses a gate insulating film 104 (yellow), gate electrode 105 (orange), insulating sidewalls 107 (green), and offset sidewalls 106 (blue).



(*Id.* at 1:35–60, Figures 16A-B (color added).) The gate insulating film 104's side ends are coextensive with the side edge of gate electrode 105 (orange), as indicated by the added red circles in Figures 16A-B. Defendants argue that this is the cause of the problem that the invention was designed to solve. Specifically, a "reduction in the dielectric constant and insulation property of the high dielectric constant gate insulating film is caused at gate electrode end part, so that device characteristics of the MISFET are deteriorated and the reliability of the gate insulating film is degraded," because the side ends of the gate insulating film are coextensive with the side edge of the gate electrode. (*Id.* at 2:4–8.)

The specification states that it is "an object of the present invention to improve characteristics of a MISFET without degrading of a high dielectric constant gate insulating film." (*Id.* at 2:9–12.) The specification then sets out "the present invention" as follows:

> Specifically, a semiconductor device according to *the present invention* includes: a high dielectric constant gate insulating film formed on an active region in a substrate; a gate electrode formed on the high dielectric constant gate insulating film; and an insulating sidewall formed on each side surface of the gate electrode. . . . [T]he high dielectric constant gate insulating film is *continuously formed so as to extend from under the gate electrode to under the insulating sidewall*, and at least part of the high dielectric constant gate insulating film located under the insulating sidewall has a smaller thickness than a thickness of part of the high dielectric constant gate

insulating film located under the gate electrode.

(*Id.* at 2:47–59 (emphasis added).) Thus, the "present invention" solves the problem of the gate insulating film deteriorating at the gate electrode edge by continuously forming the gate insulating film so it extends from under the gate electrode to under the insulating sidewall. Example of this configuration are illustrated in Figures 1 and 2.



(*Id.* at Figures 1and 2 (color added).) The red circles show that the gate insulating film (yellow) extends from under the gate electrode (orange) to under the insulating sidewall (green in Figure 1, blue in Figure 2). More importantly, the claim language of the '227, '764, '180, and '076 Patents capture this limitation. For example, Claim 1 of the '227, '764, and '180 Patents recite that "the high dielectric constant gate insulating film is continuously formed so as to extend from under the gate electrode to under the [first] insulating sidewall." ('227 Patent at 21:49–51; '764 Patent at 21:43–45; '180 Patent at 21:16–18.) Similarly, Claim 1 of the '076 Patent recites "a width of the gate insulating film along a gate length is larger than a width of the gate electrode along the gate length," and "an end of the gate insulating film under the insulating sidewall." ('076 Patent at 22:1–5.) Thus, the claim language leaves no ambiguity as to the requirement of the "gate insulating film."

Regarding Defendants' construction, the Court first notes that the construction repeats the disputed term "gate insulating film," and then adds fourteen words to it. For the reasons discussed

below, these fourteen additional words would improperly limit the meaning of "gate insulating film." First, the claims could have specified this narrower meaning of gate insulating film if that is what the patentees intended. For example, a dependent claim expressly requires non-contact with an insulating sidewall, which indicates that independent Claim 1's "gate insulating film" is not so limited. Specifically, dependent Claim 21 of the '764 Patent recites "[t]he semiconductor device of claim 1, *wherein each side end portion of the high dielectric constant gate insulating film is not in contact with the first insulating sidewall*." ('764 Patent at 22:56–58 (emphasis added).) None of the independent claims across the four patents expressly recites a "not in contact" requirement like the one in Claim 21. *Liebel-Flarsheim*, 358 F.3d at 910 ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is as its strongest." (citation omitted).) The presence of this limitation in a dependent claim indicates that the corresponding independent claim is broader, and that "gate insulating film" should not be construed as Defendants suggest.

Defendants first argue that the patents openly disparage the prior art's contact between the side ends of the gate insulating film and the adjoining sidewalls. (Dkt. No. 162 at 11 (citing '076 Patent at 1:67–2:8).) Defendants contend that "the *present invention*" solves this problem by "*prevent[ing]* end portions of the high dielectric constant gate insulating film *from being in contact* with the sidewalls." (Dkt. No. 162 at 11 (citing '076 Patent at 2:9–19, 4:42–51) (emphasis in original).)

The Court notes that both portions of the specification that Defendants cite teach that in the "present invention" the gate insulating film is under the sidewalls. This is what is universally different from the prior art, and what is recited in the claims. *See, e.g.*, '764 Patent at 2:10–14 ("To achieve the above-described object, the inventors of the present application have devised a

MISFET structure in which a high dielectric constant gate insulating film is kept remaining under sidewalls …"); 4:39-41 ("According to the present invention, a high dielectric constant gate insulating film is continuously formed so as to extend from under a gate electrode to under a sidewall."). Thus, the summary of "the present invention" does not restrict the shape or position of the ends of the gate insulating film, and none of the descriptions of "the present invention" in the specification imposes the limitation Defendants seek. Accordingly, Defendants' reliance on *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007), and *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014) is misplaced.

Second, the term "side end portions" is not defined in the specification. Indeed, the remaining figures in the patent may be understood to have more than two "side end portions." For example, Figure 5 could show six potential "side end portions," two of which are in contact with offset sidewall 6 (annotated 1A & 1B) and two of which are in contact with insulating sidewall 7 (annotated 2A & 2B).



('076 Patent at Figure 5 (annotated.) Likewise, Figure 2 could show four potential "side end portions," two of which are in contact with offset sidewall 6 (annotated 1A & 1B) and two of which are in contact with insulating sidewall 7 (annotated 2A & 2B).



('076 Patent at Figure 5 (annotated).) Defendants' construction also introduces the term "overlying," which does not appear in the specification. If Defendants' construction was indeed the "present invention," the Court would expect to find the term included in the specification. This indicates that "overlying" is not required by the claims or the specification, but instead would improperly redraft the claim language.

Defendants also argue that *all* embodiments consistently implement "the present invention" to solve the prior art's problem by avoiding contact between the gate insulating film's side ends and the overlying sidewalls. (Dkt. No. 162 at 12 (citing '076 Patent at Figures 1-15D).) Defendants contend that in Figure 1, the specification teaches that "each *side end portion* of the high dielectric constant gate insulating film 4A is *not in contact with the sidewall* 7[,]" with the added red circles showing no contact between the gate insulating film's (yellow) side ends and

overlying sidewall 7 (green).



(Dkt. No. 162 at 12 (citing '076 Patent at 6:32–34, Figure 1 (colors added) (emphasis added)).)

Defendants further argue that the specification teaches that in Figure 2 "each *side end portion of the high dielectric constant gate insulating film 4B is not in contact with the offset sidewall 6,*" to achieve the same benefits.



(Dkt. No. 162 at 12-13 (citing '076 Patent at 7:65–8:7, Figure 2 (colors added) (emphasis added)).)

According to Defendants, the specification repeats the same teaching of Figures 1 and 2 for the embodiments depicted in Figures 3 to 5, with only the gate insulating film's numeral and overlying sidewall being different. (Dkt. No. 162 at 13 (citing '076 Patent at 9:7–20, Figure 3, 9:62–10:9, Figure 4, 11:3–16, Figure 5).) Defendants argue that all disclosed embodiments and their figures "repeatedly and consistently" characterize the gate insulating film as having side ends which do not contact either the overlying sidewall 7 or the overlying offset sidewall 6. (Dkt. No. 162 at 13-14 (citing Figures 1, 3-6, 8-11, 13, 2, 7, 12, 14, 15).)

As discussed above, the "present invention" solves the problem of the gate insulating film deteriorating at the gate electrode edge by continuously forming the gate insulating film so it extends from under the gate electrode to under the insulating sidewall. For the embodiment identified by Defendants, the specification states that it is the existence of the high dielectric constant gate insulating film *under the sidewall* that makes capacitive coupling between the gate electrode and the n-type extension region stronger in the vicinity of the end portion of the gate electrode. *See, e.g.*, '076 Patent at 6:42–46, 8:13–17. Again, the claim language of the '227, '764, '180, and '076 Patents capture this limitation.

Moreover, while certain embodiments identify a "gate insulating film" whose side end portions are not in contact with a sidewall, the specification also includes embodiments where the side end portions of the gate insulating film *are* in contact with a sidewall, *See, e.g.,* '076 Patent at Figure 2 (disclosing embodiment where gate insulating film 4B is in contact with sidewall 7). Simply stated, the "gate insulating film" claim language is broader than the preferred embodiments that Defendants rely upon. "The Federal Circuit has consistently held that 'particular embodiments appearing in the written description will not be used to limit claim language that has broader effect.'" *Weatherford Tech. Holdings, LLC v. Tesco Corp.*, No. 2:17-CV-456, 2018 U.S. Dist.

LEXIS 110507, at *33 (E.D. Tex. July 2, 2018) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004)).

Thus, the Court rejects Defendants' attempt to improperly narrow the ordinary meaning of the term "gate insulating film." *Effective Expl,. LLC v. Bluestone Nat. Res. II, LLC*, No. 2:16-CV-00607-JRG-RSP, 2017 U.S. Dist. LEXIS 118002, at *39 (E.D. Tex. July 27, 2017) (rejecting proposed construction that "simply uses the exact language of the claim," but tries to "add[]" narrowing limitations to it). Finally, the Court finds that there is no "clear and unequivocal" disavowal sufficient to justify Defendants' construction. *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). For these reasons, the Court rejects Defendants' addition of limitations not found in the claim language, and gives the term its plain and ordinary meaning.

### 2. Court's Construction

For the reasons set forth above, the term **"gate insulating film"** is given its **plain and ordinary meaning.**

### B. "outer end of the insulating sidewall"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "outer end of the insulating sidewall" | "outer end of the outermost sidewall component that is directly on the gate insulating film" | "outer end of the outermost sidewall layer that is directly on the top surface of the gate insulating film" |

### 1. Analysis

The term "outer end of the insulating sidewall" appears in Asserted Claims 1 of the '180 Patent, and Asserted Claim 1 of the '076 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree the outermost sidewall must be "directly on" the gate insulating film. (Dkt. No. 159 at 13-14.) Plaintiff also states it "does not understand there to be a meaningful distinction between

'component' and 'layer' for the construction of this claim term." (Dkt. No. 164 at 10 n. 8.) Thus, there is not a dispute for this aspect of the construction. The only dispute is whether the outermost sidewall should be directly on a "the top surface" of the gate insulating film, as Defendants contend.

Defendants argue that in every embodiment of the '076 and '180 Patents, the outermost sidewall rests on the top surface of the gate insulating film. (Dkt. No. 162 at 19 (citing '076 Patent at Figures 1-15D).) Defendants contend that the specification never disclose any other embodiment where the outermost sidewall is directly on a surface of the gate insulating film other than the top surface of the gate insulating film. (Dkt. No. 162 at 19.) Defendants further contend that Plaintiff's own statements in its *Inter partes* review Patent Owner Preliminary Responses ("IPR POPRs") about the outermost sidewalls in the patents' Figures 7 and 8 compel the inclusion of "top surface." *Id.*

Plaintiff responds that there is no intrinsic or extrinsic support for the "top surface" limitation Defendants seek to impose. (Dkt. No. 164 at 9.) Plaintiff argues that "top surface" is not a term used in these patents, and to the extent the gate insulating film can be understood to have a single "top surface," all the figures depict that "top surface" under the gate. (*Id.* at 9-10.) Regarding the IPR, Plaintiff contends that in Figure 7, the outermost sidewall component *directly on* the gate insulating film is offset sidewall 6 (blue), while in Figure 8, it is insulating sidewall 7 (green).



(*Id.* at 10 (citing Figures 7–8 reproduced from Dkt. No. 162 at 20).) Plaintiff argues that this is a function of "directly on," which all parties agree is a necessary part of this claim term. (Dkt. No. 164 at 10.)

The Court notes that the surrounding language in Claim 1 of the '180 Patent recites that "an end of the high dielectric constant gate insulating film under the insulating sidewall is *located at a predetermined distance from an outer end of the insulating sidewall* toward the gate electrode." ('180 Patent at 21:19–22 (emphasis added).) The Court notes that the only discussion of "predetermined distance" in the specification appears in the following context:



In each of the first through eighth embodiments, a shape of each side surface of the high dielectric constant gate insulating film 4 in which the notch 20 is provided in the part located under each side end portion of the sidewall 7 or the offset sidewall 6 is not limited to a semicircular shape shown in FIG. 6, 7, 8 or 10. For example, each side surface of the high dielectric constant gate insulating film 4 may be a perpendicular plane to the substrate surface. That is, a side surface of the high dielectric constant gate insulating film 4 *may be located at a predetermined distance from a side end surface of the sidewall 7 or the offset sidewall 6 toward the gate electrode 5.*

('180 Patent at 20:63–21:7, Figure 6 (emphasis added).) Plaintiff argues that this describes tapered,

notched, and otherwise non-planar edges to the gate insulating film "under the insulating sidewall." (Dkt. No. 159 at 14.) According to Plaintiff, nothing in the patents or prosecution history limits the "outer end of the insulating sidewall" to a sidewall component that sits directly on a flat "top surface" of a gate insulating film. *Id.* The Court agrees that Defendants' construction introduces unwarranted ambiguity given this disclosure.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"outer end of the insulating sidewall"** to mean **"outer end of the outermost sidewall layer that is directly on the gate insulating film."**

### C. "offset sidewall"

| Disputed Term | Plaintiff's Proposal | UMC's Proposal[3] |
|---|---|---|
| "offset sidewall" | Plain and Ordinary Meaning. | "a sidewall adjacent a side of the gate electrode and spaced from the substrate" |

### 1. Analysis

The term "offset sidewall" appears in Asserted Claim 4 of the '764 Patent. The parties dispute whether the term "offset sidewall" requires construction. Plaintiff argues that UMC's construction includes two limitations that do not appear in the claims or specification. (Dkt. No. 159 at 17.) Plaintiff further argues that UMC's construction introduces needless ambiguity and redundancy. *Id.* Plaintiff contends that UMC's construction does nothing to define "sidewall," which appears in both the claim term and UMC's construction. *Id.* According to Plaintiff, the claim language already states that the offset sidewall in Claim 4 is "formed on each side surface of" the gate electrode. *Id.* Plaintiff further argues that there is no support for redundantly requiring an

---

[3] For the sole purpose of this case and this Patent, TSMC states that it takes no position on this term or its construction.

offset sidewall to both be "formed on" each side surface of the gate electrode and a "adjacent a side of" that gate electrode. (*Id.* at 18.)

Regarding the second part of UMC's construction, Plaintiff contends that defining "offset" as "spaced from the substrate" would add a limitation not grounded in the claim language or the specification. *Id.* Plaintiff argues that the phrase "spaced from" is not used in the Patent. *Id.* Plaintiff further argues that UMC uses "spaced from" to refer to a vertical distance between the offset sidewall and the substrate beneath it. *Id.* Plaintiff contends that this additional limitation on the meaning of "offset sidewall" contradicts the plain and ordinary meaning a POSITA would afford the term. (*Id.* (citing Dkt. No. 159-9 at ¶ 31).)

Plaintiff also argues that the specification consistently describes an offset sidewall as the inner spacer formed on each side surface of the gate electrode and interposed laterally between the gate electrode and an outer sidewall. (Dkt. No. 159 at 18 (citing '764 Patent at 1:52–55, 7:37–39, 10:36–38, 15:39–42, 17:29–31, 19:16–18, 15:55–59, 17:47–50, 19:33–37).) Plaintiff contends that none of these disclosures addresses how the offset sidewall is positioned vertically relative to the "substrate." (Dkt. No. 159 at 19.) According to Plaintiff, the "offset" is defined based on its horizontal position relative to the gate electrode and an outer sidewall. *Id.*

UMC argues that Plaintiff's expert, Dr. Harris, admitted that the "offset sidewall" term requires construction. (Dkt. No. 162 at 23 (citing Dkt. No. 162-2 at 225:23-226:8).) UMC further argues that a construction is required to avoid speculation as to the "offset sidewall" term's meaning. (Dkt. No. 162 at 23.) UMC contends that its construction is correct in view of the '784 Patent disclosure. (*Id.* at 24 (citing '764 Patent at 15:27–42).) UMC also argues that only one structure for the offset sidewall (*i.e.*, adjacent a side of the gate electrode and spaced from the substrate) is consistently described. (*Id.* at 24 (citing '764 Patent at 7:30–8:11, 8:35–40, 8:55–9:14,

9:36–10:2, 10:29–11:32, 13:25–14:62, 15:24–16:53, 17:13–18:30, 18:61–19:45, 19:56–20:56, 21:9–10, Figures 2-5, 7-8, 12E-G, 13E-G, 14E-G, 15A-D).) UMC contends that the specification only describes the offset sidewall as being separated from the substrate by a gate insulating film. (Dkt. No. 162 at 25.)

Finally, UMC argues that for the claimed semiconductor device to achieve its asserted advantage, the offset sidewall must be adjacent a side of the gate electrode and spaced from the substrate. (Dkt. No. 162 at 25 (citing '764 Patent at 8:3–7).) UMC contends that its construction makes clear that the offset sidewall is spaced from the substrate (*i.e.*, at least by the high dielectric constant gate insulating film that is under the offset sidewall), which is required to achieve the purported advantage of the invention. (Dkt. No. 162 at 25.)

Starting with the claim language, the Court notes that Claim 4 of the '764 Patent recites "the semiconductor device of Claim 1, wherein the first insulating sidewall is an *offset sidewall*." '764 Patent at 21:56–57. Claim 1 recites "a first insulating sidewall formed on each side surface of the gate electrode." *Id.* at 21:38–39. The Court agrees with Plaintiff that the claim language already states that the offset sidewall in Claim 4 is "formed on each side surface of" the gate electrode. UMC's construction restates that requirement, defining the offset sidewall as "adjacent a side of the gate electrode." Accordingly, the Court rejects this redundant construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("Claim construction 'is not an obligatory exercise in redundancy.'") (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Regarding the second part of UMC's construction, Claim 1 further recites that "the high dielectric constant gate insulating film is continuously formed so as to extend from under the gate electrode to under the first insulating sidewall." ('764 Patent at 21:43–45.) Thus, the consistent

description of the offset sidewall structure and method of forming that structure is captured in the claim language. As UMC argues, the specification explains that "the existence of the high dielectric constant gate insulating film 4B under the offset sidewall 6 makes capacitive coupling between the gate electrode and the n-type extension region 10 stronger in the vicinity of the end portion of the gate electrode 5." (Dkt. No. 162 at 25 (citing '764 Patent at 8:3–7).) This is recited in the claims, and UMC's construction would introduce unwarranted ambiguity into the claim language.

### 2.  Court's Construction

For the reasons set forth above, the term **"offset sidewall"** is given its **plain and ordinary meaning.**

### D.  "sidewall spacer"

| Disputed Term | Plaintiff's Proposal | UMC's Proposal[4] |
|---|---|---|
| "sidewall spacer" | Plain and Ordinary Meaning. | "a sidewall spacer that is not on top of any portion of the gate electrode" |

### 1.  Analysis

The term "sidewall spacer" appears in Asserted Claim 2 of the '779 Patent. The parties dispute whether the term "sidewall spacer" requires construction. Dependent Claim 2 recites the following:

> 2. The semiconductor device of claim 1, wherein
> the first gate electrode includes first sidewall spacers formed on side surfaces thereof and first insulating spacers interposed between the first gate electrode and the first sidewall spacers,
> the second gate electrode includes second sidewall spacers formed on side surfaces thereof and second insulating spacers interposed between the second gate electrode and the second sidewall spacers, and
> the first insulating spacers are thinner than the second insulating

---

[4] For the sole purpose of this case and this Patent, TSMC states that it takes no position on this term or its construction.

spacers.

('779 Patent at 14:23–33.) The specification provides a preferred embodiment illustrating how insulating film 8 (*e.g.*, silicon nitride film) is formed on the entire surface of the semiconductor substrate 50, as illustrated in Figure 3.



(*Id.* at 9:7–11, Figure 3 (partial) (highlight added).) The specification further states a resist pattern 11 covers the second pMIS transistor region and the insulting film 8 is subjected to dry etched as shown in Figure 5.



(*Id.* at 9:44–53, Figure 5 (partial) (highlight added).) The specification discloses that the offset spacer 8a has a thickness that "is smaller than the original thickness (e.g., about 6 nm) of the insulating film 8." (*Id.* at 9:53–55.) The specification states that after the resist pattern 11 is removed "the semiconductor substrate 50 is subjected to an oxidation treatment in, for example, plasma composed of a gas containing oxygen and at, for example, about 400° C." (*Id.* at 9:56–59.) This results in "the thickness of the interface layer 2a of the gate insulating film 52a in the first pMIS transistor region increases, from both sides thereof, by about 0.3 nm," as shown in Figure 6.



(*Id.* at 9:56–61, Figure 6 (partial) (highlight added).) The specification further discloses that "a silicon dioxide film 13a with a thickness of about 0.3 nm is formed on the upper surface and the side surfaces of the silicon film 7a of the gate electrode 53a located in the first pMIS transistor region." (*Id.* at 10:6–9.) "A silicon dioxide film and a silicon nitride film are sequentially deposited on the entire surface of the semiconductor substrate 50, and then, the deposited silicon nitride film and the deposited silicon dioxide film are etched back." (*Id.* at 11:11–14.) As shown in Figure 8, sidewall spacers l8a and 18b are formed on both sides of the gate electrodes 53a and 53b.



(*Id.* at 11:14–17, Figure 8 (partial) (highlight added).) The specification states that each of the sidewall spacers 18a and 18b includes an inner sidewall spacer 16a and 16b of a silicon dioxide film with an L-shaped cross section and an outer sidewall spacer 17a and 17b of a silicon nitride film formed on the inner sidewall spacer 16a and 16b. (*Id.* at 11:17–21.) The specification further discloses that "the silicon dioxide film 13a present on the upper face of the gate electrode 53a and on the active region 50a and the silicon dioxide film 13c present on the upper face of the gate electrode 53c and on the active region 50c are also etched back." (*Id.* at 11:49–53.) As illustrated in Figure 8, "the offset spacers 8a and the remaining silicon dioxide film 13a are interposed between the side surfaces of the gate electrode 53a and the sidewall spacers 18a, and the remaining silicon dioxide film 13a is also interposed between the active region 50a (the p-type extension regions 9a) and the sidewall spacers 18a" (*Id.* at 11:53–59.)

The specification states that in the final step a metal film (e.g., Nickel) is deposited on the

entire surface of the semiconductor and annealing is performed. (*Id.* at 12:37–38.) The specification discloses that "[t]he surface portions of the silicon films 7a, 7b, 7c, and 7c of the gate electrodes 53a, 53b, 53c, and 53d, the surface portions of the p-type source/drain regions 19a and 19b, and the surface portions of the n-type source/drain regions 19c and 19d are caused to react with the deposited metal film to form metal silicide layers 20a, 20b, 20c, and 20d," as shown in Figure 9.



(*Id.* at 12:38–44, Figure 9 (partial) (highlight added).) Given this background, the Court agrees that UMC's construction is incorrect and would be unhelpful to the factfinder, because it does not define "sidewall" or "spacer." UMC's construction restates those terms and then adds thirteen additional words. Moreover, UMC's negative limitation (*i.e.*, "not on top of any portion of the gate electrode") is not required by the intrinsic record. For a negative limitation to be read into claim, it must be supported by either "the words of the claim" or an "express disclaimer or independent

lexicography in the written description that would justify adding that negative limitation." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).

As discussed above, nothing in the Patent's claims or written description departs from the plain and ordinary meaning of a "sidewall spacer." The claim language is consistent with the plain meaning of the term. Furthermore, the specification similarly treats "sidewall spacers" as insulators flanking the sides of the gate electrode in describing both the prior art and the present invention. (*See, e.g.*, '779 Patent at 2:43–48, 4:38–46, 11:14–32.) Thus, the intrinsic evidence does not redefine "sidewall spacer" to impose a categorical limitation forbidding any portion of a sidewall spacer from being "on top of" any portion of the gate electrode.

UMC argues that in all disclosed embodiments, the sidewall spacers are formed via sequential deposition of a silicon dioxide film and a silicon nitride film over the entire surface of the semiconductor substrate and then etched back. (Dkt. No. 162 at 28 (citing '779 Patent at 11:11–17).) UMC further argues that as a result of etching, no silicon dioxide film (or silicon nitride film previously deposited on top of the silicon dioxide film) remains on top of any portion of the gate electrode. (Dkt. No. 162 at 28 (citing '779 Patent at 11:49–53).) UMC contends that this is the only arrangement disclosed in the '779 Patent, because a film would not serve to electrically isolate the gate from the source and drain contacts in that location. (Dkt. No. 162 at 28) (citing '779 Patent at 2:39–57, 4:38–63, 11:11–12:35, Figures 1-9).) According to UMC, the sidewall spacers are inherently adjacent to the side of the gate electrode, because the claim language requires that they are "formed on side surfaces" of the first and second gate electrodes, respectively. (Dkt. No. 162 at 29.)

As UMC concedes, the claim language itself requires the sidewall spacers to be "formed on side surfaces" of the first and second gate electrodes. However, neither the claim language nor

the specification further limit the "sidewall spacers." Instead, the specification discloses a preferred embodiment where silicon dioxide film or silicon nitride film previously deposited on top of the silicon dioxide film is removed. However, this is just the preferred embodiment and does not justify the negative limitation UMC urges. As Plaintiff argues, a POSITA would understand "sidewall spacer" to mean "a dielectric intended to electrically isolate a gate from a contact … adjacent to a side of the gate electrode." (Dkt. No. 164 at 13 (citing Dkt. No. 159-9 at ¶¶ 35–36).) The Court agrees and finds that UMC's additional limitation is improper and should not be read into the claims.

### 2. Court's Construction

For the reasons set forth above, the term **"sidewall spacer"** is given its **plain and ordinary meaning.**

### E. "[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers"

| Disputed Term | Plaintiff's Proposal | UMC's Proposal[5] |
|---|---|---|
| "[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers" | Plain and Ordinary Meaning. | "insulating spacers in contact with a side surface of the gate electrode between the gate electrode and the sidewall spacers" |

### 1. Analysis

The phrase "[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers" appears in Asserted Claim 2 of the '779 Patent. The parties dispute whether the phrase "[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers" requires construction. Dependent Claim 2 recites the following:

2. The semiconductor device of claim 1, wherein

---

[5] For the sole purpose of this case and this Patent, TSMC states that it takes no position on this term or its construction.

> the first gate electrode includes first sidewall spacers formed on side surfaces thereof and *first insulating spacers interposed between the first gate electrode and the first sidewall spacers*,
> the second gate electrode includes second sidewall spacers formed on side surfaces thereof *and second insulating spacers interposed between the second gate electrode and the second sidewall spacers*, and
> the first insulating spacers are thinner than the second insulating spacers.

('779 Patent at 14:23–33 (emphasis added).) Claim 2 requires that the insulating spacer be "interposed between" the gate electrode and the sidewall spacer. The Collins Dictionary 10th ed. 2009 defines "interpose" as "to put or place between or among other things." (Dkt. No. 159-23 at 4.) Thus, the claim language means what it says. The insulating spacer must be placed between those structures.

UMC's construction does not define "interposed" or any other claim term, but instead adds an unclaimed requirement that the insulating spacers be "in contact with a side surface of the gate electrode." The natural and customary meaning of "interposed between" is placed between, and not "in contact with." The plain language of the claim does not require the first or second insulating spacers to be in contact with a side surface of the gate electrode, and the specification has no applicable lexicography or clear disavowal to rewrite this claim term. Moreover, wherever the '779 Patent requires particular structures to be in contact with others, the claims and specification expressly state those requirements. (*See, e.g.*, '779 Patent at Claim 1 ("a first interface layer being *in contact with* the semiconductor substrate … a second interface layer being *in contact with* the semiconductor substrate" (emphasis added)); Claim 4 ("the second silicon film is *in contact with* the second insulating spacers") (emphasis added)); 4:4–23; 11:42–45.)

UMC argues that term should be construed to require the insulating spacers contact a side surface of the gate electrode between the gate electrode and the sidewall spacers to resolve the inherent ambiguity. (Dkt. No. 162 at 30.) As discussed above, UMC contends that the initial

deposition of the film (*e.g.*, a silicon nitride film) that forms the first and second insulating spacers covers the first and second gate electrodes. (*Id.* at 30 (citing '779 Patent at 6:13–15, 9:7–11).) According to UMC, "there is no teaching or support in the '779 patent for an insulating spacer that is *not* in contact with a side surface of the gate electrode nor is there any embodiment in which any structure other than an insulating spacer is between a gate electrode and a sidewall spacer." (Dkt. No. 162 at 30-3 (citing '779 Patent at 2:4–15, 4:38–5:3, 5:43–61, 6:5–27, 8:43–60, 9:7–11, 9:44–55, 10:6–25, 11:49–64, Figures 1-9).). UMC further argues that the oxidation teachings of the '779 Patent also require contact by the insulating spacers with a side surface of the gate electrode. (Dkt. No. 162 at 31(citing '779 Patent at Figure 6, 10:26–32).)

The Court agrees that the preferred embodiment discloses an insulating spacer that in contact with a side surface of the gate electrode. However, the claims are not limited to the preferred embodiment. Moreover, this claim term is equally understandable to a POSITA and a layperson alike. While the insulating spacers can touch the gate electrode, nothing in the claim language requires it, and UMC points to no "express disclaimer or independent lexicography" justifying its proposed additional limitation. *Omega Eng'g*, 334 F.3d at 1323.

### 2. Court's Construction

For the reasons set forth above, the phrase **"[first] insulating spacers interposed between the [first] gate electrode and the [first] sidewall spacers"** is given its **plain and ordinary meaning.**

### F. "effective work function"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "effective work function" | "a work function obtained from electrical characteristics of a MIS transistor" | Plain and ordinary meaning; no construction necessary |

## 1. Analysis

The term "effective work function" appears in Asserted Claim 15 of the '779 Patent. The parties dispute whether the term "effective work function" requires construction. Plaintiff argues that the "Summary" section of the specification defines "effective work function" as follows:

> Note that the "effective work function" is a work function obtained from electrical characteristics of a MIS transistor. Specifically, the effective work function is obtained by incorporating influence such as a level in an insulating film into a work function related to physical properties and representing a difference between a vacuum level and an energy level of a metal.

(Dkt. No. 159 at 25 (citing '779 Patent at 3:17–23).) Plaintiff contends that this is a "strong indicator of lexicography," because "quotation marks are a strong indicator that what follows is a definition" of that term. (Dkt. No. 159 at 25 (citing *Seagen Inc. v. Daiichi Sankyo Co., Ltd.*, 2021 WL 4168660 (E.D. Tex. Sept. 14, 2021)).) According to Plaintiff, the specification unambiguously defines what an "effective work function *is*." (Dkt. No. 164 at 14 (emphasis in original).)

The Court disagrees with Plaintiff's analysis. "[T]he standard for lexicography is exacting," *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020), and requires "'clearly set[ting] forth a definition of the disputed claim term' other than its plain and ordinary meaning[,]" *Thorner*, 669 F.3d at 1365 (citation omitted). That standard is not met here. The purported definition does not define what effective work function ("EWF") is, but instead addresses how to obtain EWF. The words "obtained from electrical characteristics" in the proposed construction would be understood by a POSITA as referring to *how* to obtain an EWF value through a laboratory experiment. Indeed, the specification expressly teaches that increasing a layer's equivalent oxide thickness ("EOT") (which is a physical characteristic) increases the EWF. ('779 Patent at 4:29–31 ("[S]ince an EOT of the gate insulating film of the first MIS transistor increases, an effective work function of the first MIS transistor increases."), *see also id.*,

5:64–67, 13:23–27 (same).) Accordingly, the Court agrees with Defendants that the cited passage is a high-level description about obtaining an EWF value and does not define the term.

Moreover, Plaintiff's expert, Dr. Harris, explained that EWF "has a known meaning in this art" that he "ha[s] been very familiar with for many years, even before this patent was disclosed." (Dkt. No. 162-2 at 156:18–24). Likewise, Dr. Harris does not limit the specification's definition to the one line proposed by Plaintiff in his declaration, but instead includes the further qualification that refers to physical properties and how the effective work function is obtained. (Dkt. No. 159-9 at ¶ 42 (citing '779 Patent at 3:17-23).) Again, Plaintiff's purported definition does not include the "physical properties" disclosed in the specification. Accordingly, the Court finds that "[t]he specification here does not clearly indicate the patentee's intent to give ["effective work function"] a unique meaning different from its ordinary and customary meaning to one of skill in the art." *Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010). Thus, the term is given its plain and ordinary meaning.

## 2. Court's Construction

For the reasons set forth above, the term **"effective work function"** is given its **plain and ordinary meaning.**

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the

constructions adopted by the Court.

**So ORDERED and SIGNED this 30th day of January, 2026.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE